UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 1:17-md-2804 |
| This document relates to: | Judge Dan Aaron Polster |
| Case No. 1:18-op-46139 | **SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND – SUPPLEMENT** |
| *Chelan County v. Purdue Pharma, et al.* | |

Plaintiff Chelan County ("Plaintiff") submits this supplemental pleading and Amended Complaint incorporating as if fully set forth herein its own prior pleadings and, if indicated below, the common factual allegations identified and the RICO causes of action included in the Corrected Second Amended Complaint and Jury Demand in the case of *The County of Summit, Ohio, et al., v. Purdue Pharma L.P., et al.*, Case No. 1:18-op-45090 ("*Summit County* Pleadings"), *In Re National Prescription Opiate Litigation*, in the United States District Court for the Northern District of Ohio, Dkt #513, 514[1]), and as may be amended in the future, and any additional claims asserted herein.  Plaintiff also hereby amends its complaint to alter the defendants against which claims are asserted as identified below.  To the extent defendants were previously sued in Plaintiff's existing complaint and they are no longer identified as defendants herein, they have been dismissed without prejudice except as limited by CMO-1, Section 6(e).  Dkt. #232.

---

[1] Docket #513 is the redacted Summit Second Amended Complaint and Docket #514 is the unredacted Summit Corrected Second Amended Complaint filed under seal in Case No. 1:17-md-02804-DAP.  The redacted Summit Corrected Second Amended Complaint is also filed in its individual docket, Case No. 1:18-op-45090-DAP, Docket #24.

## INCORPORATION BY REFERENCE OF EXISTING COMPLAINT

1.     Plaintiff's Existing Complaint (No. 2:18-CV-00285, Doc. #1, E.D. Wash.) is expressly incorporated by reference to this Short Form as if fully set forth herein except to the extent that allegations regarding certain defendants that are not listed in section 2 below are dismissed without prejudice.

## PARTIES – DEFENDANTS

2.     Having reviewed the relevant ARCOS data,[2] Plaintiff asserts claims against the following Defendants:

Purdue Pharma, L.P.;
Purdue Pharma, Inc.;
The Purdue Frederick Company, Inc.;
Endo Health Solutions Inc.;
Endo Pharmaceuticals, Inc.;
Janssen Pharmaceuticals, Inc.;
Johnson & Johnson;
Teva Pharmaceuticals Industries, Ltd.;
Teva Pharmaceuticals USA, Inc.;
Cephalon, Inc.;
Allergan PLC f/k/a Actavis PLC;
Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.;
Watson Laboratories, Inc.;
Actavis LLC;
Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.;
Mallinckrodt plc;
Mallinckrodt, LLC;
SpecGX LLC;
Cardinal Health, Inc.;
McKesson Corporation;
AmerisourceBergen Drug Corporation;
Par Pharmaceutical Companies, Inc.;
Par Pharmaceutical, Inc.;

---

[2] Pursuant to the Court's November 8, 2018 Order Regarding Plaintiff's Motion for Modification of CMO-1 (Dkt. 1106), the ARCOS data provided to Plaintiff reflects: "the names of all labelers (as identified by NDC code) who manufactured and/or labeled more than five percent (5%) of the market share of opioids distributed in the relevant county or county-equivalent in at least three of the nine years available in the ARCOS data" and "the name of each distributor who distributed more than five percent (5%) of the market share of opioids distributed in the relevant county or county-equivalent in at least three of the nine years available in the ARCOS data."

Mylan Pharmaceuticals, Inc.;
West-Ward Pharmaceutical Corp.;
Hikma Pharmaceuticals PLC;
KVK-Tech, Inc.;
Walgreens Boots Alliance Inc. a/k/a Walgreen Co;
Walmart, Inc.;
Richard S. Sackler;
Jonathan D. Sackler;
Mortimer D.A. Sackler;
Kathe A. Sackler;
Ilene Sackler Lefcourt;
Beverly Sackler;
Theresa Sackler;
David A. Sackler;
Trust for the Benefit of Members of the Raymond Sackler Family;
Rhodes Pharmaceuticals L.P.;
Rhodes Technologies Inc.;
Rhodes Pharmaceuticals Inc.;
Rhodes Technologies; and
John and Jane Does 1 through 100, Inclusive.

**I, David J. Ko, Counsel for Plaintiff, certify that in identifying all Defendants, I have followed the procedure approved by the Court and reviewed the ARCOS data that I understand to be relevant to Plaintiff.**

**I further certify that, except as set forth below, each of the Defendants newly added herein appears in the ARCOS data I reviewed.**

**I understand that for each newly added Defendant not appearing in the ARCOS data I must set forth below factual allegations sufficient to state a claim against any such newly named Defendant that does not appear in the ARCOS data.**

**The following newly added Defendants *do not appear* in the ARCOS data I reviewed:**

Richard S. Sackler;
Jonathan D. Sackler;
Mortimer D.A. Sackler;
Kathe A. Sackler;
Ilene Sackler Lefcourt;
Beverly Sackler;
Theresa Sackler;
David A. Sackler;

Trust for the Benefit of Members of the Raymond Sackler Family;
Rhodes Pharmaceuticals L.P.;
Rhodes Technologies Inc.;
Rhodes Pharmaceuticals Inc.; and
Rhodes Technologies.

**Dated:** <u>May 28, 2019</u>          **Signed:** <u>/s/ *David J. Ko*</u>

## FACTUAL ALLEGATIONS REGARDING INDIVIDUAL DEFENDANTS

2.1      Defendants include the entities identified below as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution sale and/or dispensing of opioids.

### SpecGX LLC

2.2      Defendant SpecGX LLC is a Delaware limited liability company with its principal place of business in St. Louis, Missouri, and is a wholly owned subsidiary of Defendant Mallinckrodt plc. SpecGX LLC manufactures Mallinckrodt's generic products and bulk active pharmaceutical ingredients.

2.3      At all relevant times, SpecGX LLC has manufactured, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers, users, and its customers the benefits and risks associated with the use of the prescription opioid drugs.

2.4      In addition, SpecGX LLC manufactured and sold prescription opioids without fulfilling its legal duty under the Controlled Substances Act to prevent diversion and report suspicious orders.

2.5      Based on the private ARCOS data made available to Plaintiff, drugs sold and manufactured by SpecGX LLC represent a substantial market share in Plaintiff's jurisdiction during the relevant time period.

2.6     Thus, SpecGX LLC's conduct directly caused and contributed to the worst man-made epidemic in modern medical history—the misuse, abuse, diversion, and over-prescription of opioids across this country, including in Plaintiff's jurisdiction.

**Par Pharmaceutical**

2.7     Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Defendant Par Pharmaceutical Companies, Inc. and holds itself out as "an Endo International Company."

2.8     Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation with its principal place of business in Chestnut Ridge, New York.

2.9     Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively as "Par Pharmaceutical." Par Pharmaceutical is an affiliate of Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.

2.10    At all relevant times, Par Pharmaceutical has packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs. Further, Par Pharmaceutical manufactured and sold prescription opioids without fulfilling its legal duty to prevent diversion and report suspicious orders.

2.11    Based on the private ARCOS data made available to Plaintiff, drugs sold and manufactured by Par Pharmaceutical represent a substantial market share in Plaintiff's jurisdiction during the relevant time period.

2.12     Par Pharmaceutical's conduct thus directly caused the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids across this country, including in this jurisdiction.

**Mylan Pharmaceuticals, Inc.**

2.13     Defendant Mylan Pharmaceuticals, Inc. ("Mylan"), is a West Virginia corporation with its principal place of business in Canonsburg, Pennsylvania.

2.14     At all relevant times, Mylan has packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs. Further, Mylan manufactured and sold prescription opioids without fulfilling its legal duty to prevent diversion and report suspicious orders.

2.15     Based on the private ARCOS data made available to Plaintiff, drugs sold and manufactured by Mylan represent a substantial market share in Plaintiff's jurisdiction during the relevant time period.

2.16     Mylan's conduct thus directly caused the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids across this country, including in this jurisdiction.

**West-Ward Pharmaceuticals Corp.**

2.17     Defendant West-Ward Pharmaceuticals Corp. is a Delaware corporation with its principal place of business located in Eatontown, New Jersey. West-Ward Pharmaceuticals Corp. is the United States agent and subsidiary of Defendant Hikma Pharmaceuticals PLC, a London-based global pharmaceutical company.

2.18    West-Ward Pharmaceuticals Corp. and Hikma Pharmaceuticals PLC are collectively referred to as "West-Ward."

2.19    At all relevant times, West-Ward has packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs. Further, West-Ward manufactured and sold prescription opioids without fulfilling its legal duty to prevent diversion and report suspicious orders.

2.20    Based on the private ARCOS data made available to Plaintiff, drugs sold and manufactured by West-Ward represent a substantial market share in Plaintiff's jurisdiction during the relevant time period.

2.21    West-Ward's conduct thus directly caused the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids across this country, including in this jurisdiction.

**KVK-Tech, Inc.**

2.22    Defendant, KVK Tech, Inc. ("KVK") is a Pennsylvania corporation with its principal place of business in Newton, Pennsylvania.

2.23    At all relevant times, KVK has packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs. Further, KVK manufactured and sold prescription opioids without fulfilling its legal duty to prevent diversion and report suspicious orders.

2.24    Based on the private ARCOS data made available to Plaintiff, drugs sold and manufactured by KVK represent a substantial market share in Plaintiff's jurisdiction during the relevant time period.

2.25    KVK's conduct thus directly caused the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids across this country, including in this jurisdiction.

### Walgreens

2.26    Defendant Walgreens Boots Alliance Inc. a/k/a Walgreen Co. ("Walgreens") is a Delaware corporation with its principal place of business in Illinois. Walgreens, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Walgreens distributed prescription opioids throughout the United States, including in Plaintiff's communities.

2.27    Based on the private ARCOS data made available to Plaintiff, drugs sold and distributed by Walgreens represent a substantial market share in Plaintiff's jurisdiction during the relevant time period.

2.28    Walgreens' conduct thus directly caused the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids across this country, including in this jurisdiction.

### Walmart

2.29    Defendant Walmart, Inc. is a Delaware corporation with its principal place of business in Arkansas. Walmart, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this

Complaint, Walmart, Inc. distributed prescription opioids throughout the United States, including in Plaintiff's communities.

2.30    Based on the private ARCOS data made available to Plaintiff, drugs sold and distributed by Walmart, Inc. represent a substantial market share in Plaintiff's jurisdiction during the relevant time period.

2.31    Walmart, Inc.'s conduct thus directly caused the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids across this country, including in this jurisdiction.

## DEFENDANTS WHO DO NOT APPEAR IN ARCOS DATA—SUPPLEMENTED

### Richard S. Sackler

2.32    Defendant Richard S. Sackler has resided in Travis County, Texas, since 2013. He became member of Purdue's board of directors the early 1990s. In 1999, he became Purdue's president.

### Jonathan D. Sackler

2.33    Defendant Jonathan D. Sackler resides in Fairfield County, Connecticut. He became member of Purdue's board of directors in the early 1990s.

### Mortimer D.A. Sackler

2.34    Defendant Mortimer D.A. Sackler resides in New York County, New York. He became member of Purdue's board of directors in the 1990s.

### Kathe A. Sackler

2.35    Defendant Kathe A. Sackler resides in Fairfield County, Connecticut. She became a member of Purdue's board of directors in the early 1990s.

**Ilene Sackler Lefcourt**

2.36    Defendant Ilene Sackler Lefcourt resides in New York County, New York. She became a member of Purdue's board of directors in the early 1990s.

**Beverly Sackler**

2.37    Defendant Beverly Sackler resides in Fairfield County, Connecticut. She became a member of Purdue's board of directors in the 1990s.

**Theresa Sackler**

2.38    Defendant Theresa Sackler resides in New York County, New York. She became a member of Purdue's board of directors in the 1990s.

**David A. Sackler**

2.39    Defendant David A. Sackler resides in New York County, New York. He became a member of Purdue's board of directors in 2012.

**Trust for the Benefit of Members of the Raymond Sackler Family**

2.40    Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Sackler Trust") is a trust for which Defendants Beverly Sackler, Jonathan D. Sackler, and/or Richard S. Sackler are trustees. The Sackler Trust is the 50% direct or indirect beneficial owner of Purdue and Purdue-related entities and the recipient of 50% of profits from the sale of opioids by Purdue and Purdue-related entities.

2.41    Collectively, Richard S. Sackler, Jonathan D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, and the Sackler Trust are referred to as the "Sackler Family Defendants."

**Rhodes Pharmaceuticals L.P.**

2.42    Defendant Rhodes Pharmaceuticals L.P. is a Delaware limited partnership formed November 9, 2007, with its principal place of business in Coventry, Rhode Island. At all relevant times, Rhodes Pharmaceuticals L.P. has marketed generic prescription opioids, including a generic form of OxyContin, which is manufactured by Purdue Pharmaceuticals L.P.

**Rhodes Pharmaceuticals Inc.**

2.43    Defendant Rhodes Pharmaceuticals Inc. is a New York corporation formed on November 9, 2007. Rhodes Pharmaceuticals Inc. is a general partner of Rhodes Pharmaceuticals L.P. Rhodes Pharmaceuticals Inc. is a general partner of Rhodes Pharmaceuticals L.P. At all relevant times, Rhodes Pharmaceuticals Inc. has marketed generic prescription opioids, including a generic form of OxyContin, which is manufactured by Purdue Pharmaceuticals L.P.

**Rhodes Technologies**

2.44    Defendant Rhodes Technologies is a Delaware general partnership formed on April 12, 2005, with its principal place of business in Coventry, Rhode Island. At all relevant times, Rhodes Technologies or its predecessor has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations.

**Rhodes Technologies Inc.**

2.45    Defendant Rhodes Technologies Inc. is a Delaware corporation formed January 28, 1999, with its principal place of business in Coventry, Rhode Island. Its predecessor was Napp Coventry, Inc. Rhodes Technologies Inc. is a general partner of Rhodes Technologies. At all relevant times, Rhodes Technologies Inc. has manufactured and supplied Purdue with

oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations or has managed Rhodes Technologies or its predecessor in doing so.

2.46    Rhodes Pharmaceuticals L.P., Rhodes Pharmaceuticals Inc., Rhodes Technologies, and Rhodes Technologies Inc. are collectively referred to as the "Rhodes Defendants."

**PERSONAL JURISDICTION**

2.47    Defendants are subject to personal jurisdiction in this judicial district because they transact and/or have transacted business in this State and within Plaintiff's community. Additionally, each Defendant solicited business within this District, engaged in a persistent course of conduct, and/or derived substantial revenue from goods used and services rendered in this State and in this District through interstate commerce. All Defendants purposefully availed themselves of the benefits, profits, and privileges deriving from their business activities in this State.

2.48    Each Defendant regularly engages in business within the State and within this District. Each Defendant has committed tortious acts that have injured Plaintiff. Each Defendant expects, or reasonably should have expected, those acts to have consequences in this State and within Plaintiff's community.

2.49    Each Defendant is engaged in the business of manufacturing and/or distributing prescription opioids, directly or through third-party entities, in the State and within Plaintiff's community. Each Defendant's activities in Plaintiff's community related to the manufacture and distribution of prescription opioids were, and are, continuous and systematic, giving rise to Plaintiff's causes of action.

## FACTUAL ALLEGATIONS—SUPPLEMENTED

### A.    The Defendant Members of the Sackler Family Direct and Control Purdue

2.50    Rarely if ever has a single family influenced the health of people and communities the way the Sackler family has. The Sacklers have devastated America through their calculated efforts to line their own pockets by addicting Americans to prescription opioids through their direction and control of Purdue.

2.51    The Sackler family has wielded extensive control over Purdue, making it virtually impossible to know where Purdue's conduct described in the Existing Complaint ends and the Sacklers' conduct begins. By occupying the majority of the board seats at Purdue for decades,[3] the Sackler Family Defendants have exercised substantial control over Purdue's conduct.

2.52    As described in Plaintiff's Existing Complaint, brothers Raymond and Mortimer Sackler were charged with running Purdue after the three Sackler brothers purchased it in the 1950s. Raymond's son, Richard S. Sackler, began working for Purdue as an assistant to the president in 1971. In addition to holding various other roles at Purdue, including leading the firm's R&D division and the sales and marketing division, Richard Sackler was named president in 1999. In 2003, Richard Sackler resigned from his role as president to become co-chair of Purdue's board of directors.[4] He participated extensively the invention, marketing, and sale of OxyContin.

2.53    In 1999, when Richard Sackler became Purdue's president, Jonathan, Kathe, and Mortimer Sackler were all vice presidents of Purdue.[5] Years later, when Purdue was mired in

---

[3] First Amended Complaint at ¶ 350, *The People of the State of New York v. Purdue Pharma L.P., et al.*, No. 400016/2018 (Sup. Ct. Suffolk Cnty. Mar. 28, 2019) ("NY Complaint").

[4] *See* Christopher Glazek, *The Secretive Family Making Billions from the Opioid Crisis*, Esquire (Oct. 16, 2017), https://www.esquire.com/news-politics/a12775932/sackler-family-oxycontin/.

[5] First Amended Complaint at ¶179, *Commonwealth of Mass. v. Purdue Pharma L.P.*, C.A. No. 1884-cv-01808 (BLS2) (Mass. Super. Ct. Jan. 31, 2019) ("MA Complaint").

investigations by federal and state authorities, they resigned their positions as vice presidents. They remained members of Purdue's board of directors.

2.54    Ilene Sackler Lefcourt, Beverly Sackler, and Theresa Sackler have served on Purdue's board of directors since the 1990s. David A. Sackler has served on Purdue's board of directors since 2012.

2.55    The Sackler Family Defendants are direct or indirect beneficiaries of some portion of the profits earned by Purdue through the sale of opioids.

2.56    The Sackler Family Defendants each knowingly aided, participated in, and benefitted from Purdue's unlawful conduct.

**B.      The Sackler Family Defendants Direct Purdue's Misconduct**

2.57    As described in the Existing Complaint, Purdue set the stage for the opioid epidemic by introducing a drug with a narcotic payload many times higher than that of previous prescription opioids, while also executing a sophisticated, multi-pronged marketing campaign to change prescribers' perception of the risk of opioid addiction and to portray opioids as an effective treatment for chronic pain.

2.58    On information and belief, the Sackler Family Defendants directed this unlawful deception campaign to maximize the sale of prescription opioids and their own profits. The Sackler Family Defendants regularly managed the family business.

2.59    Richard Sackler, a trained physician, was pivotal in the development and commercial success of OxyContin. When MS Contin, Purdue's time-release morphine pill, was approaching the expiration of its patent, Richard Sackler actively sought new uses for the

14

company's time-release "Contin" system.[6] Purdue ultimately combined the system with oxycodone, creating OxyContin.

2.60    As described in Plaintiff's Existing Complaint, Richard Sackler's efforts to find a product for the "Contin" system were drive by his desire for "Purdue to be big…*really* big."[7] In 1990, Purdue's VP of clinical research, Robert Kaiko, sent a memo to Richard Sackler and other executives recommending that the company work on a pill containing oxycodone. At the time, oxycodone was perceived as less potent than morphine, largely because it was most commonly prescribed as Percocet, the relatively weak oxycodone-acetaminophen combination pill, and because morphine was strongly associated with treating pain with terminal illness. Richard Sackler, Kathe Sackler, and other Purdue executives relied on this fundamental misunderstanding to promote OxyContin. Purdue's internal emails reveal that these executives, including the Sackler Family Defendants, personally knew that doctors incorrectly believed that OxyContin was weaker than morphine, leading them to prescribe it much more frequently.[8] Although OxyContin is in fact more potent than morphine, Richard Sackler directed staff not to tell doctors the truth, which likely would have reduced sales.[9]

2.61    The Sackler Family Defendants recognized OxyContin as the means by which Purdue, and their own fortune, could become "really big." As Purdue's Senior Vice President in charge of sales, Richard Sackler made an ominous prediction at the launch party for OxyContin. He foretold that "the launch of OxyContin Tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense, and white…."[10]

---

[6] Glazek, *supra* note 4.
[7] *Id*.
[8] *See* MA Complaint ¶ 176.
[9] *Id*.
[10] NY Complaint ¶ 273.

To create this "blizzard of prescriptions," the Sackler Family Defendants perpetuated deceptions about the safety of OxyContin and pressed Purdue's sales team to sell ever-increasing volumes of OxyContin, incentivizing sales of the more expensive (and more dangerous) higher doses.

2.62    Internal documents also reveal the extent to which the Sackler Family Defendants' greed motivated their unrelenting drive to sell more pills. For example, in one such email, Richard Sackler reacted to reported sales of over $20 million *per week* with a "yawn":

> In 1999, when employee Michael Friedman reported to Richard Sackler that Purdue was making more than $20,000,000 per week, Richard replied immediately, at midnight, that the sales were "not so great." "After all, if we are to do 900M this year, we should be running at 75M/month. So it looks like this month could be 80 or 90M. Blah, humbug. Yawn. Where was I?"[11]

### C.    The Sackler Family Defendants Knew of OxyContin's Abuse Potential No Later Than 1999

2.63    As a New York Times article explained, relying on a confidential report from the Justice Department, Purdue and the Sacklers knew about significant abuse of OxyContin in the first years after the drug's introduction in 1996.[12] In early 1999, Purdue's general counsel, Howard Udell, wrote to another Purdue official that the company had learned of references on the internet to the abuse of Purdue's opioid products.[13] Prosecutors wrote that Richard Sackler was told in 1999 about discussions in internet chatrooms about snorting OxyContin.[14]

2.64    Contrary to this knowledge of abuse of OxyContin, at a 2001 congressional hearing on the increase in opioid abuse, Purdue President Michael Friedman testified that Purdue first became aware of the abuse of OxyContin in April 2000, after news reports of people

---

[11] MA Complaint ¶ 178.
[12] Barry Meier, *Origins of an Epidemic: Purdue Pharma Knew Its Opioids Were Widely Abused*, New York Times (May 29, 2018), https://www.nytimes.com/2018/05/29/health/purdue-opioids-oxycontin.html?login=email&auth=login-email.
[13] *Id.*
[14] *Id.*

abusing the drug recreationally in Maine.[15] None of the Sackler Family Defendants attempted to correct this misrepresentation.

2.65   The Sackler Family Defendants were aware of Purdue misconduct not only because of their participation in and direction of the deceit that led to skyrocketing sales of OxyContin, but also because Purdue has been subject to significant governmental investigations and fines.

2.66   In 2007, Purdue and three executives pleaded guilty in federal court to criminal charges of misleading the public about OxyContin's addictiveness between 1995 and 2001.[16] The company and executives agreed to pay $634.5 million to settle the litigation.[17] It was during this and other investigations that the Sacklers resigned from their executive roles at Purdue, although Sackler family members remained board members and, of course, owned the company.[18]

2.67   The plea agreement leaves no doubt of Purdue's guilt. It states: "Purdue is pleading guilty … because Purdue is in fact guilty…."[19] The illegal conduct that was the basis of the 2007 plea agreement occurred while Richard Sackler was president; Jonathan, Kathe, and Mortimer were vice presidents; and Richard, Jonathan, Kathe, Mortimer, Ilene, Beverly, and Theresa Sackler were all board members.

2.68   Purdue's directors, including the Sacklers, approved a Corporate Integrity Agreement as part of the settlement with the federal government. Purdue agreed to appoint a

---

[15] Patrick Radden Keefe, *The Family that Built an Empire of Pain*, The New Yorker (Oct. 23, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain.

[16] Sara Randazzo and Jeanne Whalen, *Purdue Is Under Investigation for Opioid Painkiller OxyContin*, The Wall Street Journal (Oct. 25, 2017, 5:50pm), https://www.wsj.com/articles/purdue-is-under-investigation-for-opioid-painkiller-oxycontin-1508968220.

[17] *Id.*

[18] *See* NY Complaint ¶ 393.

[19] Plea Agreement at 2, *United States v. The Purdue Frederick Company, Inc.*, No. 1:07-cr-00029 (W.D. Va. May 9, 2007), https://www.documentcloud.org/documents/279028-purdue-guilty-plea.

compliance officer, who would make periodic reports on compliance issues to ensure that no additional deception took place. The Sacklers promised to comply with rules prohibiting deception about the company's opioids and were required to complete hours of training on the rules. Moreover, Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler each certified that he or she understood the rules and would obey them.[20]

### D. The Sacklers Established a Tangled Web of "Affiliated Entities" to Continue to Profit from Opioid Sales and to Shield Their Wealth from Purdue's Liability

2.69    Since at least 1999, the Sackler Family Defendants have known of the high potential for abuse of OxyContin. Rather than take steps to ameliorate the damage they have caused—or to prevent additional harm—the Sackler Family Defendants instead began to shift profits from Purdue and related entities to their own private trusts and accounts in order to shield them from creditors. The entities to which the Sackler Family Defendants transferred funds include PLP Associates Holding L.P., Rosebay Medical Company L.P, and Beacon Company. These transfers were and are fraudulent, unjustly enriching the Sackler Family Defendants and shielding funds available for the execution of any judgment against Purdue.

2.70    At the time of Purdue's 2007 guilty plea—in which only one of the Purdue Defendants, The Purdue Frederick Company, Inc., officially pled guilty—Purdue Pharma L.P. identified a total of 215 "related and associated entities" in its Non-Prosecution Agreement with the United States. These associated entities include, for example, petroleum and real estate companies, and twenty-five entities registered in Bermuda or the British Virgin Islands. The Sacklers—while directing Purdue to push its highly addictive drug into the poorest corners of Appalachia and to target Medicaid patients and veterans—availed themselves of the legal gray

---

[20] *Id.*; MA Complaint ¶ 192.

area available only to the wealthy, establishing international shell companies to hold and reinvest

their profits. Securities filings show, for example, that the Sacklers have directed Purdue to

purchase shares in various pharmaceutical investments, and then transferred those shares

immediately to Rosebay Medical Company L.P. and Beacon Company.

2.71    Over the years, the Sacklers have voted to distribute billions of dollars to

themselves through such associated entities. Between 2008 and 2016, the Sacklers voted to

distribute over $2 billion of Purdue's profits to PLP Associates Holding L.P.[21] The Sacklers also

voted to distribute approximately $1.8 billion to Rosebay Medical Company L.P. and Beacon

Company between 2008 and 2014.[22]

2.72    Many of the associated entities identified in Purdue's 2007 list of "associated

entities" are part of the Mundipharma network of companies, which was started by the Sacklers

and remains under their control.  Mundipharma is integral in allowing the Sacklers to both move

their wealth overseas and continue to profit from the sale of addictive opioids as government

entities in the United States work to rein in opioid prescribing. In contrast to the Sacklers' well-

documented obsession with attaching their family name to art museum wings, endowed chairs at

universities, and the like, the Sacklers have omitted their name from official statements about

Mundipharma's founding.  Press release after press release describes the Mundipharma networks

as "founded in 1956 by doctors."[23] Mundipharma International's website provides more detail

(and corrects the date), but still leaves it founders nameless: "Founded in the US by two

---

[21] Amended Complaint at ¶ 151, *State of Connecticut v. Purdue Pharma L.P.*, C.A. No. X07 HHD-CV-19-6105325-S (Conn. Super. Ct. May 6, 2019) ("CT Complaint").
[22] CT Complaint ¶¶ 153-154.
[23] *See, e.g.*, *Purdue Pharma L.P. Announces Strategic Investment in Oncology R&D*, Purdue Pharma (Nov. 14, 2017), https://www.purduepharma.com/news-media/2017/11/purdue-pharma-l-p-announces-strategic-investment-in-oncology-rd/; *Mundipharma strengthens position as a leader in biosimilars with acquisition of development company Cinfa Biotech*, Mundipharma (Oct. 2018), https://www.mundipharma.com/wp-content/uploads/2018/10/201008-Deal-release-FINAL.pdf.

physicians in 1952 and still privately owned, the network has a presence in over 120 countries."[24] But the Austrian arm of the network is more forthright:

> The Austrian company Mundipharma Ges.m.b.H. is part of a privately owned network of independent associated companies that operates internationally. The founding history dates back to 1952, when the two brothers Mortimer D. Sackler, M.D. and Raymond R. Sackler, M.D. bought the US-based company Purdue. Blessed with the necessary pioneering spirit, the owners developed a network of independent associated companies that is currently represented in numerous European countries and worldwide. The tradition of a family business has propagated over the years and is still reflected, e.g. in long-term and trusting relationships.[25]

2.73    As the corporate history webpages of various Mundipharma entities explain, it was Mundipharma that developed the prolonged-release morphine sulfate tablet in 1973,[26] which was later sold in the U.S. as MS Contin and which would be applied to oxycodone to create OxyContin. At that time, "Mundipharma" included Purdue, the UK-based Napp Pharmaceuticals Limited, which the Sacklers had acquired in 1966, and Ireland-based Napp Laboratories, which developed the fateful timed-release coating in 1973.

2.74    Today, the Mundipharma network generates over $3.4 billion in annual revenue, primarily from opioids.[27] As noted above, Mundipharma is privately owned. Little public information is available regarding that ownership. However, the information that is available reveals that companies and trusts established by the Sacklers own various parts of the Mundipharma network. For example, trusts for the benefit of Richard and Jonathan Sackler

---

[24] *About Mundipharma*, Mundipharma, https://www.mundipharma.com/about-mundipharma/ (last visited May 24, 2019).

[25] *History*, Mundipharma, https://mundipharma.at/en/history/ (last visited May 24, 2019).

[26] *See, e.g.*, Mundipharma Malaysia website stating "Mundipharma developed prolonged release technology for treating chronic pain" in 1973, Mundipharma, http://www.mundipharma.com.my/about-us (last visited May 24, 2019); *History*, Mundipharma, http://www.mundipharma.ie/history (last visited May 24, 2019).

[27] Bruce Einhorn, Timothy Annett, and Tim Loh, *OxyContin Billionaires Chase Global Profits to Offset U.S. Woes*, Bloomberg (March 30, 2019), https://www.bloomberg.com/news/articles/2019-03-30/oxycontin-billionaires-chase-global-profits-to-offset-u-s-woes.

owned half of Mundipharma Research Ltd. in Cambridge, England.[28] Rosebay Medical

Company L.P.—owned by trusts for the benefit of the Sackler Family Defendants—is one of the

two owners of Mundipharma's Australian business, according to data from the Australian

Securities and Investments Commission, and is one of the two current shareholders in

Mundipharma Pharmaceuticals Sdn. Bhd., the network's Malaysian branch, according to the

Companies Commission of Malaysia.[29]

2.75    In addition, in November 2007, just months after Purdue pleaded guilty for

deceiving patients and doctors, the Sacklers established Defendant Rhodes Pharmaceuticals L.P.,

a manufacturer of generic opioids, to continue profiting from the epidemic they helped create.

This development expanded the operations of Rhodes Technologies, Inc., which was primarily

involved with manufacture of bulk active pharmaceutical ingredients. The connection between

the Sacklers and the Rhodes Defendants was not widely known until the publication of a 2018

*Financial Times* article.[30]

2.76    In public statements responding to the opioid crisis, Purdue has claimed a

minimal role, stating, for example, that OxyContin accounted for only 1.4% of all opioid

analgesic prescriptions written between October 2017 and September 2018.[31] But the Sacklers'

establishment and control of Rhodes Pharmaceuticals L.P. means that the Sacklers are

responsible for a larger market share than that. As *Financial Times* reported, "Rhodes is a much

larger producer of opioids by volume, and the combined companies accounted for 14.4m

prescriptions that year, giving them an overall market share of 6 percent in 2016."[32]

---

[28] *Id.*

[29] *Id.*

[30] *See* David Crow, *How Purdue's 'One-Two' Punch Fueled the Market for Opioids*, Financial Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[31] *Common Myths About OxyContin (oxycodone HCI) Extended-Release Tables CII, Purdue Pharma*, https://www.purduepharma.com/news-media/common-myths-about-oxycontin/ (last visited May 10, 2109).

[32] Crow, *supra* note 30.

2.77    The Sackler Family Defendants are beneficial owners of and exercise control over not only Rhodes Pharmaceuticals L.P., but all four Rhodes Defendants. The Sackler Family Defendants thus have profited not only from Purdue's earnings on excessive prescription opioid sales, but also from the sales of opioids by multiple additional corporate entities.

### E.    The Sackler Family Defendants Continued to Oversee Purdue's Wrongdoing After the DOJ's Investigation

2.78    Purdue did little to change policies regarding the promotion of opioids, and the Sackler Family Defendants were intimately involved in continuing the misconduct. After the 2007 guilty plea, the Sacklers directed Purdue to hire hundreds of additional sales representatives.[33] The Sacklers also required their sales representatives to average at least 7.5 prescribers daily, as well as having those prescribers agree to increasing prescriptions.

2.79    Richard Sackler was especially involved in overseeing and directing sales operations. He personally went into the field, for example, to supervise Purdue's sales representatives.[34] As a result of his time in the field, he argued with Vice President Russell Gasdia that legally required warnings about opioids were unnecessary and that a warning "implies a danger of untoward reactions and hazards that simply aren't there."[35]

2.80    The other Sackler Family Defendants remained deeply involved in sales as well. In 2012, for example, Mortimer Sackler suggested Purdue reschedule an annual sales meeting from January to February so that sales representatives could "get back to work for January and back in front of doctors who enter the new year refreshed…"[36] Richard Sackler proposed canceling the meeting entirely.[37]

---

[33] NY Complaint ¶ 394.
[34] NY Complaint ¶ 393.
[35] MA Complaint ¶ 356.
[36] NY Complaint ¶ 396.
[37] Id.

2.81 Despite the company's outward appearances, the Sacklers recognized that the increased pressure on the company required loyalty to the family. In 2010, Purdue staff provided the Sacklers a 10-year plan for Purdue's opioid sales, under which the Sacklers would receive at least $700 million per year from 2010 to 2020.[38]

2.82 In 2015, the State of Kentucky filed suit against Purdue, alleging improper marketing of OxyContin created a public nuisance.[39] As part of the settlement, the state was required to destroy all documents in its possession, and a lengthy legal battle ensued over the release of court records, including Richard Sackler's deposition.[40] Richard Sackler's deposition was released publicly in February 2019.[41] The deposition and accompanying documents solidify Richard Sackler's extensive involvement in Purdue's marketing of OxyContin.[42] The released deposition testimony contradicts evidence in the 2006 Justice Department report and demonstrates that Richard Sackler knew as early as the late 1990s that OxyContin was a heavily sought street drug, despite his purported ignorance.[43] Internal marketing documents presented in the deposition also show that Purdue marketed OxyContin to doctors as less powerful than morphine, although it is actually 1.5 times the strength, to avoid the "stigma" associated with morphine.[44]

---

[38] NY Complaint ¶ 420.

[39] David Armstrong, *Sackler Embraced Plan to Conceal OxyContin's Strength from Doctors, Sealed Testimony Shows*, ProPublica (Feb. 21, 2019, 1:45pm), https://www.propublica.org/article/richard-sackler-oxycontin-oxycodone-strength-conceal-from-doctors-sealed-testimony.

[40] *Id.*; Andrew Joseph, *Purdue appeals orders to unseal OxyContin records to Kentucky Supreme Court*, STAT (Jan. 14, 2019), https://www.statnews.com/2019/01/14/purdue-pharma-appeal-kentucky-supreme-court/.

[41] Barry Meier, *Sackler Testimony Appears to Conflict with Federal Investigation*, New York Times (Feb. 21, 2019), https://www.nytimes.com/2019/02/21/health/oxycontin-sackler-purdue-pharma.html.

[42] Armstrong, *supra* note 39.

[43] *Id.*

[44] *Id.*; *see also Calculating Total Daily Dose of Opioids for Safer Dosage*, Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf (last visited May 10, 2019).

2.83    Richard Sackler's recklessness with the drug in exchange for heavy profits was further demonstrated by his pressure to get OxyContin deregulated in Germany, despite being advised that deregulation was "highly likely" to lead to abuse.[45]

2.84    While often on the offense in pushing opioids, the Sacklers found themselves on the defense more and more often after 2010. For example, in late 2017, Cigna made public statements about how opioid companies influence prescribing and dosing.[46] Cigna also replaced OxyContin on its list of covered drugs with a competitor's drug. Upon learning this, Richard Sackler suggested Purdue replace Cigna as the insurance provider for Purdue's company health plan.[47]

2.85    Bowing to increasing pressure and scrutiny, Richard Sackler and other family members resigned from the Purdue board of directors in 2018.[48]

2.86    Through their control and direction of Purdue, the Sackler Family Defendants and the Rhodes Defendants knowingly and deliberately engaged in deceptive conduct in violation of the Washington Consumer Protection Act, contributed to the creation of a public nuisance in Plaintiff's community, and participated in the Opioid Marketing Enterprise and Opioid Supply Chain Enterprise. The Sackler Family Defendants were personally aware of the harm caused by OxyContin as early as 1999, and they could have stopped further harm from occurring at any point thereafter. Instead, they continued to push deceptive messages about the benefits and safety

---

[45] Armstrong, *supra* note 39.

[46] *See* Karen Eldred, *Cigna is Committed to Reducing Opioid Use: Removing Oxycontin from Group Commercial Drug Lists on 1/1/18*, Cigna (Oct. 4, 2017), https://www.cigna.com/newsroom/news-releases/2017/cigna-is-committed-to-reducing-opioid-use-removing-oxycontin-from-group-commercial-drug-lists-on-1118 ("While drug companies don't control prescriptions, they can help influence patient and doctor conversations by educating people about their medications.").

[47] MA Complaint at ¶ 490.

[48] *See* Beth Mole, *Damning court docs show just how far Sacklers went to push OxyContin*, ARS Technica (Jan. 19, 2019, 5:00am), https://arstechnica.com/science/2019/01/family-behind-oxycontin-called-addicts-criminals-while-pushing-pills/.

of OxyContin and opioids, and they collaborated with KOLs, Front Groups, and other members of the Opioid Marketing Enterprise to increase demand for opioids and change the standard of medical care. The Sackler Family Defendants and the Rhodes Defendants also collaborated with members of the Opioid Supply Chain Enterprise to increase opioid shipments and quotas and minimize the number of suspicious orders reported. The Sackler Family Defendants and the Rhodes Defendants' conduct constitutes negligence and gross negligence, and they were unjustly enriched by it.

2.87    Over the years, the Sackler Family Defendants distributed billions of dollars from Purdue to themselves through various associated companies they created for this purpose.

2.88    Today, as the opioid epidemic that they ignited claims more American lives every day, the Sackler Family Defendants continue to promote and profit from the sale of opioids around the world, through the Mundipharma companies under their ownership and control.

## COMMON FACTUAL ALLEGATIONS

1.    By checking the boxes in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the *Summit County* Pleadings as identified in the Court's Order implementing the Short Form procedure.  Dkt. # 1282.

☒ Common Factual Allegations (Paragraphs 130 through 670 and 746 through 813)
☒ RICO Marketing Enterprise Common Factual Allegations  (Paragraphs 814-848)
☒ RICO Supply Chain Enterprise Common Factual Allegations  (Paragraphs 849-877)

2.    If additional claims are alleged below that were not pled in Plaintiff's Existing Complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here.  Plaintiff asserts the following additional facts to support the claims identified in Paragraph 6 below (below or attached):

_____

_____

## CLAIMS

3.    The following federal **RICO causes of action** asserted in the *Summit County* Pleadings as identified in the Court's implementing order and any subsequent amendments, Dkt. #1282, are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff's Existing Complaint (check all that apply):

☒ First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Marketing Enterprise (Against Defendants Purdue, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (*Summit County* Pleadings, Paragraphs 878-905)

☒ Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (*Summit County* Pleadings, Paragraphs 906-938)

4.    Plaintiff asserts the following **additional claims** as indicated (below or attached):

_____

_____

5.    To the extent Plaintiff wishes to **dismiss claims** previously asserted in Plaintiff's Existing Complaint, they are identified below and will be dismissed without prejudice.

_____

_____

WHEREFORE, Plaintiff prays for relief as set forth in the *Summit County* Pleadings in *In Re National Prescription Opiate Litigation* in the United States District Court for the Northern District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

Dated: <u>May 28, 2019</u>               /s/ *David J. Ko* _____
                                       *Attorney for Plaintiff*

4825-2561-9607, v. 2